## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **COLLEEN HYDER,** | ) | |
| **Administer ad Litem of the Estate of** | ) | |
| **Heather Schanuth,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | **NO. 3:17-cv-00285** |
| | ) | |
| **v.** | ) | **JUDGE CAMPBELL** |
| | ) | **MAGISTRATE JUDGE FRENSLEY** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
|     **Defendant.** | ) | |

## MEMORANDUM

## I.  Introduction

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. No. 36), and "Plaintiff's First, Second & Third Motions for Partial Summary Judgment" (Doc. No. 81). For the reasons set forth below, Defendant's Motion for Summary Judgment (Doc. No. 36) is **GRANTED,** in part, and **DENIED,** in part, and "Plaintiff's First, Second & Third Motions for Partial Summary Judgment" (Doc. No. 81) is **DENIED.**

Also pending before the Court are Defendant's Motion to Strike Rebuttal Expert Disclosures of Mark Winters, M.D. and Desiree Washburn, DNP, ACNP-BC, PCP-BC (Doc. No. 79), and Motion to Strike "Plaintiff's First, Second & Third Motions for Partial Summary Judgment" (Doc. No. 90).

Defendant's Motion to Strike Rebuttal Expert Disclosures (Doc. No. 79) is **DENIED**, for purposes of summary judgment, as the Court concludes it is appropriate to consider these disclosures as they relate to Plaintiff's fraudulent concealment argument. The Court expresses no opinion on whether all matters addressed in the experts' affidavits are admissible at trial.

Defendant's Motion to Strike (Doc. No. 90) Plaintiff's motion for partial summary judgment is **DENIED**, as Defendant essentially presents grounds for denying Plaintiff's motion on the merits rather than grounds for denying Plaintiff the opportunity to seek summary judgment on the issues raised.

The parties' Joint Motion to Ascertain Status (Doc. No. 94) is **DENIED,** as moot.

## II.  <u>Factual and Procedural Background</u>

This case was originally filed by Heather Guffey Schanuth, alleging medical malpractice on the part of medical personnel employed by the Blanchfield Army Community Hospital ("BACH") at the Fort Campbell military base. (Doc. No. 1). Ms. Schanuth alleged BACH personnel failed to diagnose her breast cancer, which was discovered in 2016 by another medical provider. After the lawsuit was filed, Ms. Schnauth died, and the Administrator of her Estate, Colleen Hyder, was substituted as the plaintiff in this action. (Doc. Nos. 28, 29, 31, 32, 33, 34).

The facts relevant to the issues raised by the parties are as follows. Heather Schanuth was born on July 9, 1982. (Plaintiff's Supplemental Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 82) ¶ 1). She was married to Jonathan Guffey, who, during the relevant period of time, was stationed at Fort Campbell, Kentucky. (*Id.*) As a military dependent, Ms. Schanuth was eligible to receive health care treatment at BACH until her subsequent divorce from Jonathan Guffey in late 2014. (*Id.* ¶ 2). BACH records indicate Ms. Schanuth no longer received treatment at BACH after October 2014. (*Id.*)

On June 4, 2012, Ms. Schanuth was seen at BACH, for a "well-woman exam," *i.e.*, an annual physical, and was examined by Dr. Hau La. (*Id.* ¶ 3). Ms. Schanuth was 29 years old at the time of this exam, a little over a month shy of her 30th birthday. (*Id.*)  As part of the exam, Dr. La examined Ms. Schanuth's breasts and found a "questionable" mobile nodule, at "4pm, ½ cm" in

her left breast, and a "firm" non-mobile nodule mass at 6 pm, in her right breast. (*Id.*) Ms. Schanuth had not discovered the lumps prior to Dr. La's examination. (*Id.*) Ms. Schanuth was still breastfeeding at this time. (*Id.*)

Dr. La was assigned to BACH's Blue Clinic as a primary care physician, under the supervision of Major Upneet Nijjar, M.D., the Officer-in-Charge. (*Id.* ¶ 5). Dr. La testified that, during the relevant period, he saw approximately "twenty something" patients per day, at 15-minute intervals. (*Id.*) Dr. La testified that a breast examination was part of his "well-woman exam," and that Ms. Schanuth expressed concern at that exam because she had "a family history of breast cancer," in that she had an aunt who had died in her early 30's after the cancer had metastasized to her brain. (*Id.*) Ms. Schanuth said the aunt in question was her mother's "stepsister or half-sister." (*Id.*)

BACH protocol provided that, for a woman under 30, an ultrasound would be the first step in diagnosing a palpable breast lump, and Dr. La, after looking up the recommended guidelines, decided to schedule an ultrasound. (*Id.* ¶ 6). Dr. La testified that if the ultrasound came back normal, his "next step" would be to see the patient again, go over the results, and "if need [sic] to re-examine her again," and, if the lump was still palpable, move on to a radiographic guided fine-needle aspiration. (*Id.*) Dr. La testified that he told Ms. Schanuth, "It could be something bad, could be something benign, so we're going to do some tests first, initial tests to see what's going on, and then based on that, we can go further, if needed after I come back and see you and reassess you." (*Id.* ¶ 7). In his "Assessment Plan" note of the visit, Dr. La wrote "Further management after

lab result."[1] (*Id.*) Ms. Schanuth testified that Dr. La told her he thought the lump was "fatty tissue," due to her breastfeeding. (*Id.*)

The ultrasound of Ms. Schanuth's breast was performed "off post," at Gateway Medical Center (now Tennova) in Clarksville. (*Id.* ¶ 8). The ultrasound was not performed until October 2, 2012. (*Id.*) By the date of the ultrasound, Ms. Schanuth had turned 30 years of age. (*Id.*) The ultrasound was performed by a Gateway technician, under the supervision of Dr. Loy Forsythe, a board-certified radiologist at Gateway. (*Id.*) The results of the bilateral ultrasound showed no abnormalities. (*Id.* ¶ 9). At his deposition, where the actual ultrasound images were pulled up on a computer screen, Dr. Forsythe testified that in reviewing the ultrasound images of the area of concern in Ms. Schanuth's left breast, he found no lump, lesion, cyst, or mass of anything other than breast tissue. (*Id.*) Dr. Forsythe wrote on the report, "negative study. Recommend routine screening at age 40." (*Id.*)

When asked at his deposition if he made any recommendations as to what Dr. La should do further, Dr. Forsythe replied, "No," because "[i]t's a normal study." (*Id.* ¶ 10). Dr. Forsythe testified "[g]enerally, there's a disclaimer at the bottom" of his ultrasound reports that states that "10 or 15 percent of cancers that aren't seen on imaging ... are identified in other ways, like physical examination or surgery." (*Id.*) When asked why the disclaimer did not appear on his report of Ms. Schanuth's October 2, 2012 ultrasound, Dr. Forsythe replied, "I don't know. … It typically does appear, and I've seen it multiple times. I don't see it here, though." (*Id.*) He testified

---

[1]    Plaintiff contends this note may not be referring to the breast ultrasound imaging, but may instead be referring to a lab test for cervicitis, ordered during the same visit. (Doc. No. 82, at 6). For purposes of summary judgment, the Court assumes Plaintiff's interpretation of the note is correct.

that the disclaimer – that 10-15% of ultrasound negative imaging can nonetheless be cancer – should have been on his report, but was not. (*Id.*)

Dr. Forsythe agreed that "there can be cancer in a breast with a normal ultrasound," and that a "persistently palpable mass, clinically palpable mass, is suspicious regardless of imaging findings." (*Id.* ¶ 11). He testified that the "denser the breast, the higher chance we won't see it [a mass]," and agreed that "fatty breasts" are likely to hide cancer. (*Id.*) Dr. Forsythe testified that his recommendation to begin regular mammograms at age 40 was "based on the images presented to me," and was "a piece of the pie," not intended to be a plan of care for the analysis of any possible breast lump. (*Id.* ¶ 12). When asked if the standard of care required Dr. La to do anything further in regards to Ms. Schanuth and the possibility she might still have a palpable lump, Dr. Forsythe replied that "it depends on the clinical presentation. (*Id.* ¶ 13). If she actually had palpable masses [on reexamination], then, yeah, he probably should have done more." (*Id.*) If the doctor still feels a mass in the breast, even after a negative imaging study, "he needs to do something about it." (*Id.*) Dr. Forsythe testified it was possible Ms. Schanuth had a breast lump that could not been seen on ultrasound – and it is also possible she did not. (*Id.*) According to Dr. Forsythe, breast tissue sometimes feels like lumps, and it is possible that the lump or mass that Dr. La felt in June 2012 was just tissue. (*Id.*) When asked if there was any way to reverse engineer and find the answer to that question now, Dr. Forsythe answered, "No." (*Id.*)

On or about September 13, 2012, about 2½ weeks before Ms. Schanuth's ultrasound at Gateway, Dr. La was terminated from employment at BACH. (*Id.* ¶ 14). Dr. Nijjar testified that Dr. La "was supposed to" designate a surrogate upon his leaving, to take over for the patients seen by Dr. La for whom studies or tests were outstanding, and that the surrogate could have been her.

(*Id.*) Dr. La testified his last day at BACH ended abruptly, and he did not know who took over his patients. (*Id.*)

Ms. Schanuth called BACH on October 3, 2012, and asked about the results of the ultrasound. (*Id.* ¶ 15). Peggy Mayfield, a nurse, spoke to her on that date, informed her that she would try to "get results sent for Provider for review," and said she would "call her back sometime today or tomorrow." (*Id.*) Dr. Nijjar accessed Ms. Schanuth's medical record on October 4, 2012, for approximately one minute. (*Id.* ¶ 16). At her deposition, Dr. Nijjar testified that while she has no memory of it, this would be consistent with her referencing Ms. Schanuth's record in connection with the ultrasound results which had been sent from Gateway. (*Id.*) If so, Dr. Nijjar testified she would have "looked at the prior history, low risk patient, young patient, no first-degree relatives. I didn't do the exam, but I would have notified my nurses to alert her and let her know that the results were negative and to do follow up if anything changes." (*Id.*) She testified that her course of action would have been different if the imaging was not negative, and would have depended on the recommendations from the radiologist. (*Id.* ¶ 16).

Carmen Allen, a nurse at BACH, called Ms. Schanuth with the ultrasound results on October 9, 2012, at 8:35 a.m. (*Id.* ¶ 17). At her deposition, Ms. Allen testified that she read to Ms. Schanuth exactly what Dr. Forsythe had written on the imaging report, i.e., "negative study, recommend routine screening at age 40." (*Id.*) Ms. Allen noted in the record "patient verbalized understanding and agrees with POC," which stands for "plan of care." (*Id.*) Ms. Allen testified that she understood Dr. Forsythe's notes to be a plan of care, as "he made a recommendation and I read her exactly what he said." (*Id.* ¶ 18). According to Ms. Allen, as an RN, she could communicate negative results to patients, but not abnormal results. (*Id.*) Ms. Allen said Ms. Schanuth did not ask any questions when she read the results to her. (*Id.*) Ms. Allen testified that

she was not aware whether Dr. La was still at BACH at this time, but that "the results were in the clinical notes for … any of the providers to see." (*Id*.) According to Ms. Allen, the "next person that sees her or for follow up visits, they can look at that [the ultrasound results]." (*Id.* ¶ 23).

Rebecca Lunnemann, Ms. Allen's supervisor, testified that "usually a provider reviews them [imaging results], but nurses can give normal results . . . they can read reports to a patient ... they don't typically interpret it . . . they can just read verbatim a report to a patient." (*Id.* ¶ 19).

Ms. Schanuth's electronic medical record contains a notation, under the heading "Disposition," stating, "Referred for appointment." (*Id.* ¶ 20). This entry is tagged as occurring at the exact same time (08:35 CDT) as Ms. Allen reading the results to Ms. Schanuth. (*Id*.) Ms. Allen was not asked at her deposition about the entry. (*Id*.) However, Dr. Nijjar testified this means Ms. Allen referred Ms. Schanuth to have another appointment (at which, presumably, the breast study could be discussed). (*Id*.) Ms. Lunnemann testified the notation means Ms. Allen instructed the patient to follow the original plan of care and follow up with a provider. (*Id.* ¶¶ 21, 22). Plaintiff disputes these interpretations of the notation. (*Id*.) For purposes of summary judgment, the Court will not consider this testimony about the meaning of the notation.

Dr. Nijjar, in her testimony, interpreted Dr. Forsythe's recommendation to have routine mammograms at 40, as a plan of care because, "the imaging was normal." (*Id.* ¶ 24). She testified that such a plan of care would not preclude considering "further workup for a persistent mass . . . [D]id the patient still have a persistent mass? Did she follow up and say something changed? It depends on … if things were changing or persisting." (*Id*.) Dr. Nijjar testified that "in a low risk patient who had a negative ultrasound where the radiologist said 'No further followup' - 'no further imaging until the 40-year old routine mammogram,' I would follow that plan." (*Id.* ¶ 25). But "[i]t depends on the clinical history of risk and if the lesion is changing. If the patient . . . follows up

and tells me that things are changing, I would review the facts and then make a decision based on that . . . It depends on if the lesion is changing. If . . . certain lesions have been evaluated by the appropriate imaging and the imaging was negative, then to me that is a normal study, normal evaluation . . . unless something changes . . . It would be for the patient to come back and tell me something has changed." (*Id.*) Dr. Nijjar testified that Ms. Allen, "from what I can see," instructed Ms. Schanuth "to make a follow up appointment. So, if the lesion were to change, patient has the responsibility to come back and let the clinician know that it changed." (*Id.*)

At her deposition, Ms. Schanuth testified that someone from BACH's Blue Clinic called her with the ultrasound results and told her "that I had nothing to worry about, it was just tissues, to do my normal checkup." (*Id.* ¶ 26). She testified that "fatty tissue" is what Dr. La told her he thought the lumps he felt on June 4, 2012 were, and that they were common for breast-feeding mothers. (*Id.*) She said she had no reason to not believe what she was told about the ultrasound, "because I was breast feeding." (*Id.*) Ms. Schanuth was not asked at her deposition about the "referred for appointment" notation on the BACH records. (*Id.*) Ms. Schanuth said she stopped breast feeding at the end of December 2012. (*Id.* ¶ 27).

Ms. Schanuth was asked at her deposition if she was given any specific follow up instructions from Dr. La, and replied "just do my normal routine and … I will be due for a mammogram when I'm 40." (*Id.* ¶ 28). When asked if she was given any other instructions in October 2012, after the ultrasound, she testified "No. Just come in on October and - no, there wasn't. There was not." (*Id.*)

While emphasizing that he did not know exactly what he would have done next had he still been employed at BACH when the ultrasound results came in, Dr. La testified he would have seen Ms. Schanuth again, go over the ultrasound results with her, re-examine her, and then, if the lump

was still felt, "do a … radiographic guided fine-needed aspiration." (*Id.* ¶ 29). He testified that he told Ms. Schanuth he would see her again after the ultrasound, and noted in the record, "Further management after lab result." (*Id.*) Dr. La testified that "I'm sure if she were really concern [sic] about this, I think the patient has a big - the initiative, too, and say, 'Hey, … the ultrasound's normal, but I still want to see the doctor to discuss with the doctor my concern, maybe.' …" (*Id.* ¶ 30). He agreed there is "no definitive, 100 percent answer in terms of what it [a palpable lump] could be until you have a tissue biopsy." (*Id.*) Dr. La said he could not "say the lump is still there or not yet, but I would say because I felt a lump, and then also the ultrasound said they couldn't find a lump, I would definitely want to see her back to make sure she's okay." (*Id.* ¶ 31). According to Dr. La, one possibility was that the ultrasound failed to detect the lump that he felt on June 4, 2012, and another possibility is that whatever he felt was no longer there by the date of the ultrasound, and it went away on its own. (*Id.*)

Ms. Schanuth testified that, after the 2012 ultrasound results, she continued to feel the lump in her left breast, and it continued to get bigger and harder. (*Id.* ¶32). She testified that "I just felt it, and it was still there, and, you know, it was just fatty tissue." (*Id.*) Even though she was no longer breastfeeding, Ms. Schanuth testified, "I figured, you know, just it's still fatty tissue." (*Id.*)

Ms. Schanuth was seen at BACH on approximately 24 other occasions from October 2012 until October 2014, when she stopped getting treatment there as a result of divorcing her service member husband. (*Id.* ¶ 24). Plaintiff contends the lump continued to be listed in Ms. Schanuth's electronic medical record on the "Problem List" for providers to see during her visits to BACH during this period, and the failure on the part of these providers to perform any follow-up was negligent. Ms. Schanuth testified that she believes a May 28, 2013 visit with Amy McIntosh, a nurse practitioner at BACH, was a "well-woman exam" because a vaginal and breast exam was

performed after Ms. Schanuth advised Ms. McIntosh of the persistent left breast mass or lump. (*Id.* ¶¶ 37, 90). Ms. Schanuth testified Ms. McIntosh told her the lump was just "fatty tissue." (*Id.* ¶ 37). There is no medical record reflecting that Ms. Schanuth had a "well-woman exam" during this visit. (*Id.* ¶ 35).

After her last visit to BACH in 2014, Ms. Schanuth started receiving treatment at Women First Clinic, a private clinic in Clarksville. (*Id.* ¶ 50). On February 10, 2015, Ms. Schanuth visited the clinic for a "well-woman exam" and was seen by Lindsay Piper-Tedder, a nurse practitioner. (*Id.* ¶¶ 51, 52). Ms. Piper-Tedder testified she examined both breasts, and that she did not document anything in the record for the left breast, "which means it was normal per my exam." (*Id.* ¶¶ 53, 54). Ms. Piper-Tedder ordered an ultrasound on the right breast, which was performed under the supervision of Dr. Forsythe, and came back negative. (*Id.* ¶ 57).

On March 16, 2016, Ms. Schanuth visited Women First Clinic for another "well-woman exam" and was seen by Darlene Adams. (*Id.* ¶ 61). Ms. Adams found a very large mass in the left breast, and ordered an ultrasound. (*Id.* ¶¶ 61, 62). A subsequent biopsy and PET scan confirmed that Ms. Schanuth had "metastasis throughout her body." (*Id.* ¶ 62). Ms. Schanuth was ultimately diagnosed with Stage 4 breast cancer, and underwent six cycles of chemotherapy. (*Id.* ¶¶ 62, 70). Ms. Schanuth's cancer metastasized to her brain, and she died on April 21, 2018, at age 35. (*Id.* ¶ 70).

Plaintiff filed an administrative tort claim with the U.S. Army on April 18, 2016. (*Id.* ¶ 73). A final agency decision denying the claim was issued on August 16, 2016. (*Id.*) Plaintiff filed this civil action on February 15, 2017. (*Id.*)

# III. <u>Analysis</u>

## A.  <u>The Standards Governing Motions for Summary Judgment</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014).  The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132.  Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## B.  <u>Federal Tort Claims Act and Tennessee's Statute of Repose</u>

Plaintiff brings her claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1), a limited waiver of the federal government's sovereign immunity granting federal

courts exclusive jurisdiction over actions "for money damages. . . for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." The Supreme Court has construed the phrase "law of the place where the act or omission occurred" as referring to the law of the state in which the negligent or wrongful act or omission occurred. *Richards v. United States,* 369 U.S. 1, 11, 82 S. Ct. 585, 592, 7 L. Ed. 2d 492 (1962); *see also Vaughn v. United States,* 134 F.3d 373, 1997 WL 809911, at *3 (6th Cir. 1997).

Because the allegedly negligent act or omission in this case occurred in Tennessee, Defendant argues Tennessee's three-year statute of repose for medical malpractice actions, Tennessee Code Annotated § 29-26-116(a)(3), applies to bar Plaintiff's claims. Section 29-26-116(a)(3) provides:

> (3) In no event shall any such action be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after discovery that the cause of action exists.

Plaintiff argues Tennessee's statute of repose is preempted by the filing requirements of the FTCA, specifically 28 U.S.C. § 2401(b), which provides that a tort claim against the United States "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing . . . of notice of final denial of the claim by the agency to which it was presented."[2]

---

[2]  A medical malpractice claim accrues under the statute when the plaintiff "'knows both the existence and the cause of his injury.'" *Amburgey v. United States,* 733 F.3d 633, 636 (6th Cir. 2013) (quoting *United States v. Kubrick,* 444 U.S. 111, 113, 100 S. Ct. 352, 62 L.Ed.2d 259 (1979)).  Under this "inquiry notice"

In *Huddleston v. United States,* 485 Fed. Appx. 744 (6ᵗʰ Cir. 2012), the Sixth Circuit held that Tennessee's statute of repose applied to bar the plaintiff's medical malpractice action under the FTCA. The plaintiff in *Huddleston* filed his administrative claim over three years after the alleged negligence, and filed his lawsuit over four years after the alleged negligence. In reaching its decision, the court concluded that "[p]laintiffs must satisfy § 2401(b) in addition to – rather than in place of – meeting substantive state tort-law requirements." 485 Fed. Appx. at 745. The court also explained that such a result does not violate the Supremacy Clause:

> The statute of repose is a substantive requirement, not just a procedural hurdle. *See, e.g., Cronin v. Howe,* 906 S.W.2d 910, 913 (Tenn.1995); *Montgomery v. Wyeth,* 580 F.3d 455, 468 n. 7 (6th Cir.2009). Unlike a statute of limitations, which eliminates the remedy available to plaintiffs, Tennessee's statute of repose extinguishes the cause of action itself. *Id.* Such substantive limitations apply to suits brought against the United States under the FTCA, which permits liability only where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 2674 ('The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . .'). Because federal law incorporates state substantive law for the purposes of FTCA claims, applying Tennessee's statute of repose to FTCA plaintiffs does not run afoul of the Supremacy Clause.

*Id.,* at 745-46. The court expressly left open the issue of "whether Huddleston could bring suit if he had filed his administrative claim with the VA within three years because Huddleston did not, in fact, file his claim with the VA until December 2009, two months after the statute of repose extinguished his claim." *Id.,* at 746.

As Defendant points out, courts disagree over the issue left open in *Huddleston. Compare*

---

rule, the claim accrues when the plaintiff "'possesses enough information with respect to h[is] injury that, [h]ad [he] sought out independent legal and [expert] advice at that point, [he] should have been able to determine'" whether to file an administrative claim. *Peterson v. United States,* 2018 WL 6039242 (Oct. 16, 2018) (quoting *Hertz v. United States,* 560 F.3d 616, 618 (6ᵗʰ Cir. 2009)); *see also Pinilla v. United States,* 760 Fed. Appx. 164, 168-70 (4ᵗʰ Cir. 2019).

*Kennedy v. United States Veterans Admin,* 526 Fed. Appx. 450, 457-59 (6th Cir. 2013) (Judge White, concurring) (opining that Ohio's statute of repose is preempted where the plaintiff filed his administrative claim during the four-year statute of repose period, but filed suit after the four-year period had expired); *Eiswert v. United States,* 322 F.Supp.3d 864 (E.D. Tenn. 2018);  and *A.J.J.T. v. United States,* 2016 WL 3406138 (M.D. Tenn. Jun. 21, 2016); *with Augutis v. United States,* 732 F.3d 749 (7th Cir. 2013) (opining that Illinois' four-year statute of repose was not preempted by FTCA where administrative claim was filed within the four-year period, but suit was filed after four-year period had expired).

In *Kennedy*, a Sixth Circuit decision issued a year after *Huddleston,* the court held that the Ohio statute of repose did not bar the plaintiff's FTCA claim based on certain state law decisions construing the statute. 526 Fed. Appx. at 454-56. Because the state statute did not apply to bar the plaintiff's claim, the court reasoned, there was no conflict between the state statute and the FTCA, and it was not necessary to consider the preemption issue left open in *Huddleston. Id.* In a concurring opinion, however, Judge White explained that, because interpretation of the state statute was not clear, she would resolve the appeal by holding the state statute was preempted by the FTCA under the circumstances presented:

> Kennedy was injured in November 2006 and filed his administrative claim in November 2008, within the boundaries of both the Ohio repose period and the FTCA limitations period. Kennedy did not receive the agency's notice of denial until August 2010, which began the six-month federal limitations period to bring his claim in federal court, but left only three months remaining on the state repose period. Defendant accurately observes that it was not impossible for Kennedy to comply with both the Ohio statute of repose and FTCA statute of limitations since he could have filed his claim in federal court within three months after receiving the administrative denial or earlier. However, it is clear that Congress intended the administrative process to be the preferred method for resolving tort claims against the federal government and that a plaintiff engaging in that process have six months after the agency denial to evaluate his or her position. Because the Ohio medical-malpractice statute of repose operates in this case to undercut the federal procedure,

it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' and thus does not apply under conflict preemption principles. *Arizona v. United States,* 567 U.S. ——, 132 S.Ct. 2492, 2501, 183 L.Ed.2d 351 (2012) (internal quotation marks omitted).

Section 2401(b) was enacted to provide a more efficient and effective process for resolving tort actions against the federal government. That process imposed no time limits on the federal agency considering the claim and provides the claimant six months after the agency denial to file suit in federal court. The process is mandatory, and all its components and time limits are part of the whole of the FTCA scheme. Congress clearly intended that a claimant who files a timely claim with the agency will have properly invoked the administrative process and is entitled to file suit within six months of the agency decision, which Kennedy did. To conclude otherwise would allow agencies to delay notices of denial in order to allow the statute of repose to extinguish a plaintiff's claim. This outcome is not what Congress intended when it enacted § 2401(b).

*Id.,* at 458–59 (footnote omitted).

In another concurring opinion, Judge Hood expressed his agreement with the court's interpretation of the Ohio statute, but noted, "the majority opinion in this matter should not be read to foreclose the application of preemption doctrine in other instances where an actual conflict between state and federal law concerning the time to commence a suit under the Federal Tort Claims Act arises on the facts." *Id.,* at 459.

Plaintiff claims BACH providers were negligent in failing to diagnose her breast cancer from June 4, 2012, when Ms. Schanuth was seen by Dr. Lau, and continuing through October 8, 2014, the date of Ms. Schanuth's last visit to BACH. As discussed above, Ms. Schanuth ultimately received this diagnosis on March 16, 2016. Plaintiff filed an administrative tort claim with the U.S. Army on April 18, 2016. A final agency decision denying the claim was issued on August 16, 2016, and Plaintiff filed this action on February 15, 2017.

In order to apply Sixth Circuit authority on the preemption issue, the Court must divide Plaintiff's claims into two different time periods. Tennessee's statute of repose, according to

*Huddleston,* results in barring any negligence claims based on events occurring three years or more before the date Plaintiff filed her administrative claim, *i.e.,* earlier than April 18, 2013. For any claims arising during that period, there is no conflict between the state statute and the FTCA because Plaintiff did not file an administrative claim within three years after the alleged negligence.

As for the negligence claims arising on or after April 18, 2013 until Ms. Schanuth's last visit to BACH on October 8, 2014, Plaintiff filed her administrative claim before the expiration of three-year repose period on April 18, 2016, and therefore, a conflict exists, as in *Kennedy,* between compliance with the FTCA and Tennessee's statute of repose. For the claims arising during this time period, the Court is persuaded by Judge White's concurring opinion in *Kennedy* that the preemption doctrine applies to bar application of the statute of repose. *See also Cloer v. United States,* 2011 WL 2218104 (M.D. Tenn. Jun. 7, 2011) (holding statute of repose did not bar claim based on continuing failure to diagnose over three and one-half-year period before date suit was filed). To hold otherwise would punish an FTCA claimant for following the Congressionally-mandated administrative claim process. Accordingly, the Court concludes the FTCA preempts application of the statute of repose for claims based on the negligence of providers at BACH that occurred between April 18, 2013 and October 8, 2014.

## C. <u>Fraudulent Concealment</u>

Plaintiff also argues the statute of repose does not bar any of her claims because the "fraudulent concealment" exception applies. *See* Tenn. Code Ann. § 29-26-113(a)(3) ("In no event shall any such action be brought more than three (3) years after the date on which the negligent act or omission occurred except where there is a fraudulent concealment on the part of the defendant . . . ) Defendant argues Plaintiff is prohibited from raising the exception because the Magistrate

16

Judge denied Plaintiff's request to amend her complaint to reference fraudulent concealment.[3] The Court is of the opinion that Plaintiff should be allowed to raise the issue given Defendant's relatively recent amendment of its own pleadings to assert the statute of repose as a defense. The parties have addressed the merits of the fraudulent concealment issue in their briefs, and the Court believes the issue is ripe for adjudication.

To establish the fraudulent concealment exception to the statute of repose, the plaintiff must show: "(1) the health care provider took affirmative action to conceal the wrongdoing or remained silent and failed to disclose material facts despite a duty to do so, (2) the plaintiff could not have discovered the wrong despite exercising reasonable care and diligence, (3) the health care provider knew of facts giving rise to the cause of action and, (4) a concealment, which may consist of the defendant withholding material information, making use of some device to mislead the plaintiff, or simply remaining silent and failing to disclose material facts when there was a duty to speak." *Shadrick v. Coker,* 963 S.W.2d 726, 736 (Tenn. 1998).

The Tennessee Court of Appeals has described "material facts" as those facts involving matters "not already known by the patient or that are not within the realm of common experience." *Green v. Sacks,* 56 S.W. 3d 513, 520 (Tenn. Ct. App. 2001). "To be material, these facts must involve the patient's medical condition and must consist of the sort of information that a reasonable

---

[3]     Defendant moved to add the statute of repose defense to its Answer on June 14, 2019 (Doc. No. 35). After Plaintiff failed to respond, the Magistrate Judge granted the motion on July 9, 2019 (Doc. No. 44). On July 14, 2019, Plaintiff moved to add the fraudulent concealment theory to her Complaint (Doc. No. 51). The Magistrate Judge denied the request on September 6, 2019, concluding Plaintiff had not established she was diligent in attempting to meet the deadlines set in the case management order for seeking to amend pleadings. (Doc. Nos 76, 77).   Plaintiff did not appeal the Orders of the Magistrate Judge to this Court. However, Plaintiff's fraudulent concealment argument – an argument based on the language of the statute of repose – responds to Defendant's repose defense. Absent Defendant raising a repose defense, Plaintiff would have no need to argue fraudulent concealment, and thus, pleading as much is not required under Rules 8 or 9 of the Federal Rules of Civil Procedure.

person in the patient's position would want to know in order to understand and to make decisions regarding medical matters." *Id.* Whether particular information is material is guided, in part, by expert medical testimony. *Id.*

The analysis in G*ivens v. Josovitz,* 343 S.W.3d 76, 77 (Tenn. Ct. App. 2010), on this issue, is instructive as the facts in that case bear some similarity to those at issue here. In *Givens,* one of the defendants, an internal medicine physician, sent the decedent to a urologist after a test in October 2000 revealed an elevated PSA level. *Id.* The urologist performed a biopsy, which was benign. *Id.* The decedent continued to visit the internist for other health issues, but the doctor did not discuss the need for repeat prostate testing with him until 2004. *Id.*, at 78. In May 2004, the decedent was diagnosed with advanced prostate cancer, and died in September 2005. *Id.* The plaintiffs' expert testified the decedent's prostate cancer must have been diagnosed by December 2001 for the decedent to have survived. *Id.* It was undisputed that the defendants had no knowledge of the decedent's prostate cancer as of December 2001. *Id.*, at 78, 82.

After initially filing suit in April 2005, the plaintiffs took a voluntary non-suit, and filed a second action in September 2006. *Id.,* at 79. The defendants argued Tennessee's three-year statute of repose barred the suit, and the plaintiffs argued the fraudulent concealment exception applied. *Id.*, at 79-80. The court ultimately agreed with the defendants, holding the fraudulent concealment exception did not apply because the plaintiffs could not prove the defendants had actual knowledge of the cause of action – the decedent's prostate cancer – by December 2001. *Id.*, at 82-83. Elevated PSA levels alone, the court reasoned, do not conclusively establish prostate cancer. *Id*.

In reaching its decision, the court explained, "'failure to correctly diagnose an ailment cannot be the basis for a fraudulent concealment claim unless the defendant had knowledge of the correct diagnosis.'" *Id.,* at 82 (quoting *Tigrett v. Linn,* 2010 WL 1240745 (Mar. 31, 2010)). "One

cannot conceal what one does not know." *Id.* "'[A]n honest mistake made by a physician in diagnosing the cause of a patient's infirmity, standing alone, is not evidence of fraudulent concealment.'" *Id.; see also Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 625 (Tenn. 2005) (holding proof of *actual* knowledge of facts giving rise to the cause of action is required to establish fraudulent concealment).

In an effort to establish the fraudulent concealment exception applies here, Plaintiff has filed the most recent affidavits of her experts.[4] Two of the experts, Dr. Mark Richard Winters and Desiree Washburn, DNP, ACNP-BC, PNP-BC, make the following assertions in their affidavits:

- During the phone call on October 9, 2012, Carmen Allen concealed from Ms. Schanuth that Dr. La had departed BACH, and further concealed that Ms. Schanuth would need to see a new replacement provider to specifically follow-up on the breast lump issue. (Doc. No. 78-1 ¶¶ 6, 7; Doc. No. 78-3 ¶¶ 3, 4, 6, 7). Ms. Allen also concealed that no replacement primary care provider was in charge of Ms. Schanuth's care and diagnosis of her breast lump. (*Id.*) Ms. Allen also concealed that she was not capable of interpreting the negative ultrasound test, nor determining the next step in the plan of care to diagnose the breast lump. (Doc. No. 78-1 ¶ 10; Doc. No. 78-3 ¶¶ 3, 4).[5]

- The primary care provider who saw Ms. Schanuth after the October 2, 2012 ultrasound had the "continuing duty to disclose" the fact that the ultrasound required further clinical correlation and further testing *if the breast lump or mass persisted. . .*" (Doc. No. 78-1 ¶¶ 9, 11; Doc. No. 78-3 ¶ 8) (emphasis added).

---

[4]   As noted above, Defendant has filed a motion to strike these affidavits (Doc. No. 79) because they opine on the fraudulent concealment issue even though Plaintiff was denied permission to raise the issue by amendment to her Complaint. Defendant also argues the experts' opinions regarding fraudulent concealment are not admissible under the Federal Rules of Evidence. For purposes of summary judgement, however, the Court concludes it is appropriate to consider the opinions, and therefore, Defendant's motion to strike the affidavits is denied. The Court expresses no opinion on whether all matters addressed in the experts' affidavits are admissible at trial.

[5]   As Defendant points out, it is undisputed that Ms. Allen read the ultrasound report to Ms. Schanuth verbatim during the phone call, and that the medical record indicates Ms. Schanuth was "referred for appointment" in connection with Ms. Allen's call to her. (Doc. No. 82 ¶¶ 17, 18, 20). Furthermore, Ms. Allen testified she did not know Dr. La had left BACH when she spoke with Ms. Schanuth (Doc. No. 37-7, at 19). For purposes of summary judgment, however, the Court will assume the "facts" suggested by the experts are supported by the record.

- The clinic concealed Ms. Schanuth's unresolved breast lumps remained present on the "Problem List" but were being ignored. (Doc. No. 78-1 ¶ 10).

Although these experts use the terms "concealment" and "misrepresentation," the conduct they describe here is negligent conduct. Like the plaintiffs in *Givens,* Plaintiff here cannot establish the BACH providers had actual knowledge of Ms. Schanuth's breast cancer during the period for which her claims are otherwise barred by the statute of repose – June 2012 to April 18, 2013. As in *Givens*, the "facts" known by BACH providers during this period – that Dr. La had felt a lump in Ms. Schanuth's left breast in June 2012 and an ultrasound in October 2012 was negative for cancer – do not conclusively establish Ms. Schanuth had breast cancer. The experts' opinions that the BACH providers should have done more to ensure follow-up care supports a claim for negligence; they do not establish the BACH providers had actual knowledge of facts that would have led to the "correct diagnosis," if revealed. While the Court's analysis of fraudulent concealment must be informed by medical opinion, the term is still a legal one, and under applicable law, application of the exception requires more than negligent conduct on the part of defendants. Accordingly, the fraudulent concealment exception to the statute of repose does not apply.

**D.  Visits to BACH between April 18, 2013 and October 8, 2014**

Defendant argues that Plaintiff cannot establish negligence occurred during her visits to BACH between April 18, 2013 and October 8, 2014 – the period for which Plaintiff's claim is not barred by the statute of repose. Defendant contends that any alleged negligence occurring during this period stems from "the genesis of the original malpractice claim – than an 'unresolved' breast lump was not followed up on in October 2012, and that Ms. Schanuth was wrongly advised that the 'plan of care' following the negative ultrasound would be to have routine mammograms

starting at 40 years of age." (Doc. No. 37-1, at 45).

In order to establish liability, Plaintiff must show that a BACH medical provider failed to act in accordance with the applicable standard of care. *See, e.g.,* Tenn. Code Ann. § 29-26-115. In that regard, Plaintiff's expert, Dr. Winters, opines: "Multiple BACH providers who interacted with Heather Schanuth between October 2012 and October 2014 violated the standard of care required of primary care providers." (Doc. No. 78-1 ¶ 4; ¶¶ 11, 13 (further opining that each provider had a continuing duty to follow-up on the breast lump listed on Ms. Schanuth's medical record "Problem List.")). In addition, Ms. Washburn opines: ". . . each BACH provider who saw or interacted with Heather Schanuth between October 2012 and October 2014 had a continuing duty to review her patient Problem List which contained breast lump or mass as a recorded, continuing and unresolved medical problem." (Doc. No. 78-3 ¶ 8)).

Based on these affidavits, and other evidence in the record, the Court concludes that there exist genuine issues of material fact precluding summary judgment as to the alleged negligence of BACH providers occurring between April 18, 2013 and October 8, 2014.

**E. Women First Clinic**

Defendant also argues Plaintiff cannot establish the alleged negligence of BACH providers proximately caused her injury because Ms. Schanuth's "well-woman exam" on February 10, 2015 at the Women First Clinic was an "intervening cause." As discussed above, Ms. Schanuth was examined by Lindsay Piper-Tedder, a nurse practitioner, during that visit, and Ms. Piper-Tedder testified that she did not detect a lump in Ms. Schanuth's left breast at that time. According to Defendant, Ms. Piper-Tedder's conclusion establishes either that Ms. Schanuth's breast cancer could not have been detected during her earlier visits to BACH, or that Ms. Piper-Tedder was herself negligent by failing to conduct an adequate examination. If the former is true, Defendant

argues, BACH providers are not negligent, and if the latter is true, Ms. Piper-Tedder's intervening negligence breaks the chain of legal causation between the alleged negligence of the BACH providers and Ms. Schanuth's eventual injury.

Although Tennessee has adopted a comparative fault system, the doctrine of intervening cause, also referred to as superseding cause, has survived that adoption. *See, e.g., Godbee v. Dimick,* 213 S.W.3d 865, 883 (Tenn. Ct. App. 2006). "'The essential elements of the defense of superseding cause are as follows: (1) the harmful effects of the superseding cause must have occurred after the original negligence; (2) the superseding cause must not have been brought about by the original negligence; (3) the superseding cause must actively work to bring about a result which would not have followed from the original negligence; and (4) the superseding cause must not have been reasonably foreseen by the original negligent party.'" *Borne v. Celadon Trucking Servs., Inc.,* 532 S.W.3d 274, 299 (Tenn. 2017) (quoting *White v. Premier Med. Grp.,* 254 S.W.3d 411, 417 (Tenn. Ct. App. 2007)).

Defendant has not addressed these requirements, nor has it otherwise shown summary judgment is appropriate on this record. As Defendant recognizes, "[a]t any trial in this matter, the trier of fact will likely hear expert and fact testimony regarding the likelihood of Ms. Schanuth surviving her breast cancer had it been detected on various dates along the timeline." (Doc. No. 37-1, at 49). In other words, the medical experts do not agree on the date when Ms. Schanuth's breast cancer *could* have been diagnosed, nor do they agree on whether Ms. Schanuth would have survived had it been diagnosed at various points after her first visit to BACH, or on the date of her subsequent examination by Ms. Piper-Tedder at Women First Clinic. *Compare* Deposition of Jigar Shah (Doc. No. 37-14, at 54-55) (suggesting there is no way to know whether the breast cancer that ultimately resulted in Ms. Schanuth's death could have been detected in earlier years); *with*

Supplemental Statement of Dr. Richard T. Grapski (Doc. No. 78-2) (opining the breast cancer likely could have been detected as early as June 4, 2012). Thus, it is not possible, on this record, to rule out the possibility that successful treatment of the cancer required it to be discovered before Ms. Piper-Tedder's examination, in which case, her negligence would not operate as an intervening cause. Accordingly, genuine issues of material fact preclude summary judgment on Defendant's intervening cause argument.

## F. **Collateral Source Payments**

In her motion for partial summary judgment, Plaintiff argues Tennessee Code Annotated § 29-26-119,[6] which requires collateral source payments be deducted from the damages available in medical malpractice actions, does not apply here because it conflicts with the Medicaid statutes and other laws governing the collateral sources from whom Ms. Schanuth received payments. Defendant contends Plaintiff's argument is premature, relying on a decision of the Tennessee Court of Appeals in *McKenzie v. Women's Health Services – Chattanooga, P.C.,* 2018 WL 4005511 (Tenn. Ct. App. 2018), in which the court held the statute does not come into play until the factfinder finds liability, and thus, the statute does not abrogate the evidentiary aspect of the collateral source rule. The Tennessee Supreme Court refused to accept discretionary review in

---

[6] Section 29-26-119 provides:

> In a health care liability action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury, including, but not limited to, cost of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

*McKenzie,* however, and designated the lower court opinion as "Not for Citation." (Rule 11 den., designated "Not for Citation" by Tenn. Sup. Ct. Order of February 20, 2019).

Notwithstanding the precedential value of *McKenzie*, the Court declines to address the collateral source issue based on the record presented. Plaintiff's motion does not cite to facts in the record addressing the nature and type of collateral source payments received by Ms. Schanuth. Plaintiff's brief makes reference to the Medicaid statute, but does not establish, as a factual matter, that Ms. Schanuth received payments from Medicaid and under what circumstances or conditions those payments were received.[7] The Court is not obliged to "scour the record" to find support for the parties' arguments. *See, e.g., Shorts v. Bartholomew*, 255 Fed. Appx. 46, 50 (6th Cir. 2007) ("[W]e need not scour the record or make a case for a party who has failed to do so on his own behalf . . . "). Thus, Plaintiff has not established she is entitled to summary judgment as to the applicability of Tennessee Code Annotated § 29-26-119.

## G. Comparative Fault

Plaintiff also seeks summary judgment that Defendant cannot prove the comparative fault of Dr. Loy Forsythe, Tennova Medical Center, Lindsay Piper-Tedder, and Women's First Clinic. Dr. Forsythe is the radiologist who prepared the ultrasound reports in October 2012 and in February 2015. He was employed by Gateway (now Tennova) Medical Center. Plaintiff argues Defendant's expert, Dr. Patricia Tepper, opines only that Dr. Forsythe may "possibly" have committed malpractice, which is not sufficient to prove his negligence. Plaintiff does not cite to

---

[7]  A search of the record reveals an Affidavit of Amanda Sueiro (Doc. No. 84), a legal assistant who works with Plaintiff's attorney, in which she relates her efforts to obtain documents from the Medicaid administrators in Tennessee and California. Plaintiff does not address this affidavit, or any other factual evidence, in her brief.

the record where Dr. Tepper's opinion has been filed, however, and a review of the record has not revealed it. Again, the Court is not obliged to sour the record for evidence supporting the parties' arguments, and Plaintiff has not established she is entitled to summary judgment regarding the comparative fault of Dr. Forsythe and Tennova Medical Center.

Plaintiff argues she is entitled to summary judgment regarding Ms. Piper-Tedder, and her previous employer, Women First Clinic, because Ms. Schanuth's cancer had reached metastasis and was incurable by the time she was treated by these providers. As discussed above, the medical experts do not agree on the date when Ms. Schanuth's breast cancer *could* have been diagnosed, nor do they agree on whether Ms. Schanuth would have survived had it been diagnosed at various points after her first visit to BACH, or on the date of her subsequent examination by Ms. Piper-Tedder at Women First Clinic. Consequently, genuine issues of material fact preclude summary judgment on the comparative fault of Ms. Piper-Tedder and Women First Clinic.

## IV. <u>Conclusion</u>

For the reasons discussed above, the defendant's motion for summary judgment is granted in part and denied in part, and the plaintiff's motion for partial summary judgment is denied.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE